**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JERRY CHILDRESS,
<u>Plaintiff-Appellant,</u>

v.

No. 95-1283

STATE FARM FIRE AND CASUALTY
COMPANY,
<u>Defendant-Appellee.</u>

Appeal from the United States District Court
for the Western District of Virginia, at Big Stone Gap.
Samuel G. Wilson, District Judge.
(CA-94-116-B)

Argued: March 6, 1996

Decided: September 16, 1996

Before ERVIN and MOTZ, Circuit Judges, and BUTZNER, Senior
Circuit Judge.

_____

Affirmed by unpublished opinion. Judge Ervin wrote the opinion, in
which Judge Motz and Senior Judge Butzner joined.

_____

**COUNSEL**

**ARGUED:** Anthony Elmer Collins, Wise, Virginia, for Appellant.
Howard Chowning McElroy, WHITE, BUNDY, MCELROY,
HODGES & SARGENT, Abingdon, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

ERVIN, Circuit Judge:

After a fire destroyed his house, Jerry Childress tried to recover under his State Farm Fire and Casualty Company homeowner's policy. State Farm denied the claim on the grounds that Childress had intentionally set the fire and had intentionally concealed or misrepresented material facts during the investigation. A jury found that State Farm had proven by clear and convincing evidence that Childress made material false statements during the investigation, but found that State Farm had not proven by clear and convincing evidence that Childress had intentionally started the fire.

Childress contends that he is entitled to a new trial because the jury's two-part verdict was inherently inconsistent. That argument fails. Because the responses to the two special interrogatories can be reconciled under several possible theories, the jury's resolution of this case must stand.

Childress further argues that the district court should have granted his motion for judgment notwithstanding the verdict, **1** or in the alternative, for a new trial, because State Farm presented insufficient evidence to prove that he intentionally made false, material statements during the investigation. Again, Childress is not persuasive. State Farm presented enough evidence contradicting Childress's statements to have convinced a reasonable jury that Childress concealed or misrepresented material facts. We affirm.

_____

**1** A 1991 Amendment to Fed. R. Civ. P. 50 abandoned the terms "judgment notwithstanding the verdict" and "directed verdict." The new version uses motion for "judgment as a matter of law" to refer to both pre-verdict and post-verdict motions under Rule 50.

2

I.

Jerry Childress's home in Dickenson County, Virginia, was destroyed by fire on Sunday night, June 13, 1993. Childress lived alone and was the sole named insured on a homeowner's insurance policy in effect at the time of the fire.

According to Childress, there had been an electrical storm on the Saturday night before the fire. On Sunday morning, only a trickle of water flowed from the bathroom faucet. After he was unable to fix the problem using the switch and breaker, Childress went to shower at his parents' house, about 5 minutes away. From there he went to church, and then to his fiancee's house. Later that afternoon, Childress returned to the house with his father to work on the water problem. Still unsuccessful, Childress drove his father home and returned to his fiancee's, leaving the breaker off and all the doors and windows secured. Childress's father twice returned to the house that day. Neither Childress nor his father noticed anything unusual or amiss during any of their visits to the house.

At about 11:00 p.m., Childress drove back to his house to sleep. He testified that, when he arrived at about 11:30, he saw flames burning through the gable at the upper right end of the house. He went first to the garage to save his father's car. The car was gone, but his brother's motorbike was there, and Childress pushed it away from the house. Childress testified that he was unable to enter the house because of the heavy smoke and instead drove to his parents' house to call for help. When fire fighters arrived about fifteen minutes later, flames had consumed the house and had burned out the floor joists in the middle of the house.

On June 14, 1993, State Farm agent Liz Woodward retained Kenneth Riddleberger, an independent expert, to determine the cause of the fire. Riddleberger examined the fire scene on June 15, 1993, in the presence of Woodward and Childress. In the yard, in an area between about thirty and fifty feet from the house, Riddleberger found large unblackened pieces of glass, which apparently had been blown out by an explosion. The glass had come from a window in the right rear section of the house, where the master bedroom, hallway, utility room, closet, and bathroom were located. Because the glass was not black-

3

ened by smoke, Riddleberger concluded that the explosion occurred at the time the fire was ignited. Woodward and Riddleberger later testified that Childress told them that he had heard an explosion from the right side of the house after he arrived home to find the house in flames.

Inside the right rear section of the house, Riddleberger found evidence consistent with a high intensity fire and the presence of flammable liquids. In the basement of the right rear section of the house, Riddleberger found a piece of melted glass and a melted steel gun barrel. Riddleberger testified that temperatures exceeding 1,350 degrees would have been required to melt the glass and temperatures higher than 2,600 degrees would have been required to melt the gun barrel--heat far exceeding that of a normal house fire. In typical fires, thin glass will sag slightly, but not melt, and a gun barrel will not ordinarily melt.

While at the scene on June 15th, Riddleberger told Childress and Woodward that he concluded that the fire had been caused by an explosion in the right rear section of the house, intentionally created with a flammable liquid. Childress told Riddleberger that no flammable liquids, aerosols, bottled gas, or heat-producing appliances were present in the living area of the house.

On June 15, Riddleberger took two samples of flooring from the house. Returning on July 14, 1993, Riddleberger took a sample of scrapings from the melted gun barrel and Woodward took two samples of liquid stored in two containers found in a livestock trailer on Childress's property. An independent chemical analyst, Richard Henderson, tested the samples for flammable liquids. One of the flooring samples, and both of Woodward's liquid samples tested positive for a petroleum product in the "kerosene range" (which includes kerosene, number one fuel oil, jet fuel, and some charcoal lighters). The barrel scrapings sample tested positive for a petroleum product in the "medium range" (including mineral spirits, charcoal lighter, paint thinner, and some solvents).

The positive flooring sample was then analyzed by Douglas Crawford, a Mississippi State Laboratory chemist, and tested positive for ammonia and nitrate. The compound ammonium nitrate is explosive,

4

and when combined with kerosene, produces a substance called ampho, used as an explosive in mining and constructing roads and ditches.

Thomas Eaton, an independent expert in fire causation and electrical and mechanical failures, also went to the house with Woodward on July 14, 1993. Eaton later testified that he examined the utility pole, the outdoor and attic heat pump units, the service entrance panel, the washer and dryer, the microwave and range top, and the well pump, but found no problems that might have caused the fire. Eaton concluded that lightning did not cause the fire.

Lastly, Eaton examined part of the water system. He cut a piece of the underground water line where it entered the house. He testified that the line was full of mud. Checking to see if mud had gotten into the house, Eaton also turned over the water heater. He found mud and clay inside. Eaton concluded that the pump had been pumping muddy water. Childress, in contrast, testified that he had experienced no problems with the water, but suggested that after the fire, mud might have entered the water system through damaged pipes.

State Farm presented evidence that Childress had experience with explosives. During the mid 1980s, he attended shot fireman's school, run by the Virginia Division of Mines in Big Stone Gap, Virginia, and was certified as an underground shot firer. Since the mid 1980s, he had occasionally used dynamite for blasting. At the time of the fire, he worked as a shearer operator in an underground coal mine. State Farm also introduced evidence that no one other than Childress had access to the house, that the doors were locked, that there was no indication of a break-in, and that no one observed anyone else at the house before the fire.

On the question of motive, State Farm showed that the house was on the market at the time of the fire. On February 1, 1993, Childress listed the property with a realtor for $120,000.00. The realtor never showed the house--which was located in a remote, rural area--to a prospective buyer. Childress himself had shown the house to five people, but had not found a buyer. Childress explained that he wanted to sell the house because it was too large for him and he wished to move with his girlfriend to Abingdon, Virginia. Selling the house would

5

have enabled Childress to pay off some of his debts and have more money available each month. Childress stated that his uncle had agreed to buy Childress's house for $100,000.00 if the uncle were able to sell his own house in Michigan before Childress found a buyer.

As further evidence of motive, State Farm established that Childress was in debt at the time of the fire. His revolving credit card balance totalled $19,000.00, and he was able only to meet the minimum payments, which totalled $780.00 per month. Childress also made monthly payments of $670.00 on two bank notes totalling $43,000.00. Thus, Childress's monthly expenses exceeded the $1,680.00 monthly take-home pay from his job at Clinchfied Coal Company. In addition, $450.00 in real estate taxes had been overdue since December 1992.

On September 3, 1993, in accordance with provisions of the policy requiring Childress to submit to examinations under oath, Childress made sixteen statements that State Farm alleged to be untrue:

1. That he had no responsibility for setting the fire;

2. That he did not personally set the fire;

3. That he had made no arrangements to have the fire set;

4. That his uneducated guess about how the fire started was that it was electrical, either from the heat pump or from the breaker box area due to lightning;

5. That he did not hear an explosion when he was at the house at the time of the fire;

6. That, as he turned off the highway from his girlfriend's house onto his driveway on the Sunday night of the fire, he saw a red glow and flames;

7. That, other than the incidents with the low pressure switch and the problems with the discoloration, he had no problem with his water system, well system, or water pump;

6

8. That he had no idea how the mud found in his water line got there;

9. That the last time he used the water it was clear;

10. That he could not think of any explanation for the dirt, mud, clay, or other foreign material in the water line, other than the usual residue build-up around the edges;

11. That the last water he used in the house was good water;

12. That he could not think of any reason why the water inside the water tank would be dirty;

13. That, as he was going back to the house from his girlfriend's to spend the night on Sunday, he discovered the fire;

14. That he was headed home from his girlfriend's on Sunday night to go to bed;

15. That he was going to the house Sunday night rather than his parents' house because he stayed there; and

16. That he was going to the house with no water on Sunday night because he could still sleep there, and it was around midnight, and his mother and father were in bed.

About six months after the fire, State Farm denied Childress's claim on the bases that Childress intentionally set the fire and violated the "false swearing" provision of the policy by intentionally misrepresenting material facts to State Farm during its investigation of the loss. Childress filed a motion for judgment in the Circuit Court of Dickenson County. State Farm removed the case to the district court. Jurisdiction in the district court was based on diversity of citizenship, with an amount in controversy greater than $50,000, under 28 U.S.C. § 1332.

7

The case was tried before a jury on January 25-26, 1995. After the close of evidence, the jury was charged with three special interrogatories:

> 1. Has State Farm Fire and Casualty Company proven by clear and convincing evidence that after the fire loss, Jerry Childress made a statement or representation of fact to State Farm during its investigation of the fire that was intentionally false?

> If your answer to Question No. 1 is YES, then answer Question No. 2 and Question No. 3. If it is NO, answer Question No. 3 only.

> 2. Has State Farm proven by a preponderance of the evidence that the false statement or representation made by Jerry Childress during State Farm's investigation was material to State Farm's investigation as it was then proceeding?

> 3. Has State Farm proven by clear and convincing evidence that Jerry Childress intentionally set the fire that destroyed his property?

The jury answered questions 1 and 2 "yes" and answered question three "no." Accordingly, the district court entered judgment in favor of State Farm. Childress filed a motion for j.n.o.v. or, in the alternative, for a new trial. The district court denied the motion.

II.

A.

Childress's policy attached the following proviso, which is standard in Virginia fire insurance policies:[2]

_____

[2] The Virginia Code sets out a standard false swearing provision to be included in all fire insurance policies:

> This entire policy shall be void, if whether before or after a loss, the insured has willfully concealed or misrepresented any mate-

8

> This policy is void as to you and any other insured, if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss.

When invoking a "false swearing" clause to avoid a loss, a carrier must prove a willful, material misstatement by clear and convincing evidence. Childress argues that the jury's verdict was inherently inconsistent. Because it found that he did not intentionally set the fire, he contends, it could not rationally have found that he misstated material facts concerning the origin of the fire. Accordingly, he contends that the district court abused its discretion by denying his motion for a new trial.

Childress's argument both overstates the nature of the jury's verdict and fails to approach it with the imaginative percipience demanded by the standard of review. This court has instructed that special verdicts be viewed as "expressing a rational view of the case" and that "[t]he answers to special verdicts should be reconciled under any rational theory of the evidence." Bristol Steel & Iron Works v. Bethlehem Steel Corp., 41 F.3d 182, 190 (4th Cir. 1994).

In answering "no" to question 3, the jury may have believed the testimony of State Farm's witnesses that the fire was intentionally set, but may have concluded that State Farm had not met the "clear and convincing" standard in proving that it was Childress who set the fire.[3] That conclusion would not conflict with a finding that at least one of the sixteen statements to State Farm was intentionally false and material.[4] For example, the jury may have credited Eaton's testimony

_____

> rial fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

Va. Code. § 38.2-2105(A.) (1994).

[3] Indeed, as the interrogatories are written, they seem to contemplate the possibility of this very result. The record does not indicate that Childress made any objection to the form of the verdict before the jury was charged.

[4] If statement one, two, or three was among the statements which the jury believed untrue by clear and convincing evidence, then the special

9

that mud was inside the water heater and disbelieved Childress's statements that he had no problem with the water system and that the water was clear on the day before the fire. Because the verdict can be rationally reconciled, it must stand.

B.

Childress argues that State Farm presented insufficient evidence to prove that he intentionally concealed or misrepresented material facts during the investigation. He contends that State Farm did not establish which statements were materially false and did not show that it relied on those statements. Accordingly, so the argument goes, the district court should have granted Childress a JNOV or a new trial.

Again, Childress's argument fails. State Farm produced a significant amount of evidence directly contradicting Childress's sixteen sworn statements. For example, Childress stated that he did not hear an explosion at the time of the fire, but Riddleberger and Woodward testified that Childress told them that he had heard an explosion. Childress also stated that the water was good and clear, yet Eaton testified that he found mud and clay in the water system. And so on. It is impossible to know which of Childress's statements the jury disbelieved, but easy to find sufficient evidence to contradict many of them.

Childress additionally argues that State Farm failed to prove that the relevant statements, even if false, were material to State Farm's investigation. On the issue of materiality, the district judge instructed the jury:[5]

> Materiality of a false statement made during an insurance
> company's investigation is not to be judged by what the

_____

verdict would, indeed, be inconsistent. However, as Childress concedes, it is impossible to know which of the sixteen statements the jury disbelieved.

[5] Because neither party has raised the issue, we express no opinion as to whether, under Virginia law, the issue of materiality is for the court or the jury to decide.

10

facts later turn out to have been. The purpose of a provision requiring an insured to give truthful answers is to enable the insurance company to acquire knowledge or information that may aid it in its further investigation, or that may otherwise be significant to the company in determining its liability under the policy, and the position that they take with respect to the policyholder's claim.

The materiality requirement is satisfied if a false statement concerns a subject relevant and germane to the insurer's investigation as it was then perceived. Thus, false statements are material if they might have affected the attitude and action of the insurer.

They are equally material if they are said to have been calculated either to discourage, mislead or deflect the company's investigation in an area that might seem to the company at that time a relevant or productive area to investigate.

Childress made no objection to those instructions, but now contends that State Farm was required to prove that it actually relied on the false statements during its investigation. On the contrary, the Virginia Supreme Court held long ago that an insurer that invokes a policy's express "false swearing" clause to defend against a claim--as distinguished from an insurer bringing an action for common-law fraud--need not demonstrate that it was prejudiced by the insured's mendacity. Virginia Fire & Marine Ins. Co. v. Vaughan, 14 S.E. 754, 757 (Va. 1892). We find no indication that Virginia's law has since changed. Most other courts agree with the Virginia Supreme Court that allowing insurers to invoke a policy's false swearing clause without the common-law burden of proving detrimental reliance best serves the underlying goal of protecting insurers from post-loss fraud. See e.g., Hall v. State Farm Fire & Cas. Co. , 937 F.2d 210, 214 (5th Cir. 1991) (applying Mississippi law); J.C. Wyckoff & Assoc., Inc. v. Standard Fire Ins. Co., 936 F.2d 1474, 1485-86 & n.16. (6th Cir. 1991) (applying Michigan law); St. Paul Mercury Ins. Co. v. Salovich, 705 P.2d 812, 814-15 (Wash.App. 1985). Thus, we conclude that State Farm was not required to show that it relied upon Childress's statements. Furthermore, although we cannot know which of the statements the jury found false, we find that all were material

11

to the cause of the fire, to Childress's whereabouts or to Childress's possible motives--and thus were material to State Farm's investigation as it was then proceeding.

For the reasons stated, the verdicts of the jury and the judgments of the district court are

AFFIRMED.

12